# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| HAJI AZAM, | Civil No. 14-1044 (JRT/BRT) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY OF COLUMBIA HEIGHTS, | |
| Defendant. | |

Michael Kemp, **MET LAW GROUP**, 500 Laurel Avenue, St. Paul, MN 55102, for plaintiff.

Ryan M. Zipf and Daniel P. Kurtz, **LEAGUE OF MINNESOTA CITIES,** 145 University Avenue West, St. Paul, MN 55103, for defendant.

Plaintiff Haji Azam ("Azam") brings claims against the City of Columbia Heights ("the City") based on the City's policing of his multi-unit apartment buildings and the eventual revocation of his rental licenses. For almost four years, the City pressured Azam to improve his buildings through a number of mechanisms, including mitigation plans, fees, and threats of rental license revocation. Finally, in 2014, the City revoked Azam's rental licenses, forcing him to sell his buildings. Azam alleges violations of his Fourth and Fourteenth Amendment rights, claims under 42 U.S.C. §§ 1981, 1982, and 1985, and disparate treatment and disparate impact claims under the Fair Housing Act ("FHA"). The City moves for summary judgment on all of Azam's claims.

Azam has failed to produce evidence supporting an inference of discriminatory intent as required to establish a number of his claims. He has also not shown that the

City intruded on a constitutionally protected area or an area in which he had a reasonable expectation of privacy as required for a Fourth Amendment claim.  The City's actions were not truly irrational and did not shock the conscience or offend judicial notions of fairness as required to sustain a substantive due process claim.  Finally, even if Azam has established a prima facie case of disparate impact under the FHA, he has not shown a viable alternative to satisfy the City's legitimate interest in ensuring compliance with its health and safety codes.  Accordingly, no genuine issues of material fact remain, and the Court will grant the City's motion for summary judgment in its entirety.

## BACKGROUND

Plaintiff Azam owned[1] five residential apartment buildings in Columbia Heights, including a four-unit building on Pierce Street, two seven-unit buildings on Tyler Street, and two eleven-unit buildings on University Avenue, purchased between 1997 and 2004. (Aff. of Ryan M. Zipf ("Zipf Aff."), Ex. A (Dep. of Haji Azam ("Azam Dep.")) at 12:19-22; 13:4-5; 20:3-11, May 15, 2015, Docket No. 22.)  He set rent at a rate comparable to other units in the area, and he did not know if his units would qualify as "affordable housing."  (*Id.* at 26:25-27:14.)  Azam offered month-to-month leases, which allowed either party to terminate the lease with 30 days' notice.  (*Id.* at 103:20-104:24.)  Azam's Tyler Street and Pierce Street properties are both located in the Sheffield neighborhood, which has a history of crime and nuisance activity, and generally has more minority and

---

[1] Prior to filing the present motion, Azam transferred ownership of the properties to various corporate entities, but he retained control as principal.  (Notice of Removal, Ex. A ("Compl.") ¶¶ 3-4, Apr. 11, 2014, Docket No. 1; Zipf Aff., Ex. C at 1.)

low-income residents.  (Zipf. Aff., Ex. D (Dep. of Captain Lenny Austin ("Austin Dep.")) at 37:1-22, 62:17-63:8; Aff. of Michael Kemp ("Kemp Aff."), Ex. DD, June 5, 2015, Docket No. 26.)   Azam's University Avenue properties are located elsewhere in Columbia Heights.  (Kemp Aff., Ex. DD.)

Between 2009 and 2014, Azam had many interactions with the City involving his properties, which will be discussed in the following sections.  Azam placed his properties on the market in June 2013 because they were causing him too much stress.  (Azam Dep. at 64:17-65:15.)  He eventually sold all of his properties for less than what he thought was fair value after his first licenses were revoked in March 2014. (Zipf Aff., Ex. C at 17.)

## I.     THE CITY'S PROPERTY CODE

### A.     Rental Licenses

To legally lease a rental unit in Columbia Heights, property owners must obtain the City's permission in the form of a rental license.  Columbia Heights City Code §§ 5A.404, .407.  The license lasts for one year and is renewable for another year by application.  *Id.*  The City issues a license if it finds that the building complies with the Property Maintenance Code ("Property Code").  *Id.* § 5A.404.  The City may revoke or suspend a rental license based on noncompliance with the Property Code after providing notice and a public hearing.  *Id.* § 5A.408(A)-(B).  If the City revokes two or more rental licenses held by one owner, he or she becomes ineligible to hold a license in the City for five years.  *Id.* § 5A.408(E).

According to Fire Chief Gary Gorman ("Chief Gorman"), the fire department can inspect the common areas and exterior of a multi-unit dwelling for code violations without an administrative search warrant.  (Zipf Aff., Ex. F (Dep. of Gary Gorman ("Gorman Dep.")) at 119:24-120-4.)  The fire department enforces the codes through criminal citations, compliance orders, abatement, or a recommendation of license revocation to the City Council.  (*Id.* at 38:16-39:17.)  When a property owner fails to remedy a code violation, the City customarily revokes his or her license.  (*Id.* at 39:23-40:4.)

In 2013, there were approximately 8,055 households within Columbia Heights, and the City issued 945 rental licenses.  (Zipf Aff., Ex. G at 20.)  From 2009 to September 2014, the City Council revoked 113 rental licenses for failure to comply with the City Code.  (*Id.* at 3-13.)  Azam's licenses appear to be the only ones revoked based on "[p]ersistent disproportionate number of police calls, criminal activity" and generically titled "housing code violations."  (*Id.* at 3-4.)  Aside from Azam and one other owner whose license was revoked for "[f]ailure to pass Building Department inspection," the chart listed the owners' **specific** violations.  (*Id.* at 13.)

## B.     Nuisance Service Call Fees

The City Public Health and Safety Code ("Safety Code") provides for a repeat nuisance call fee in order "to prevent and abate repeat service response calls by the city to the same property or location for nuisance service calls" because they "prevent police or public safety services to other residents of the city."  Columbia Heights City Code § 8.801.  The City may impose a repeat nuisance service call fee if it responds to three or

more nuisance misconduct calls at a property within a year.  *Id.* § 8.804(A).  Before imposing a fee, the City must notify the owner of the fee's basis, and the owner may request a hearing in front of the City Council.  *Id.* §§ 8.805, 8.806.

From January 2010 to September 2014, the City issued 57 repeat nuisance service call fees to other property owners, excluding Azam.  (Zipf Aff., Ex. G at 13-19.)  Comparatively, in 2013, the City issued 21 nuisance service call fees to Azam.  (Kemp Aff., Ex. LL.)  Police Department Captain Lenny Austin ("Captain Austin") reviews properties that meet the criteria for a nuisance service call fee and issues the notification letter to the property owner.  (Austin Dep. at 65:8-66:4.)  Sometimes Captain Austin rescinds these fees when owners call and ask.  (*Id.* at 65:10-17.)  Azam called Captain Austin to dispute some of his fees and some of them were reversed.  (Azam Dep. at 124:9-19, 126:7-16.)  Azam knew he could appeal to the City Council to contest his fees, but he never did. (*Id.* at 126:17-24.)

### C.    Mitigation Plans

The City also enters into mitigation plans with rental property owners, through which the City provides recommendations aimed at reducing criminal activity in the rental building.  (Austin Dep. at 48:17-49:4.)  According to Captain Austin, some owners enter into mitigation plans because they have lost control of their apartment buildings and need police assistance.  (*Id.* at 53:13-21.)  Participation in a mitigation plan is voluntary; a landlord is not required to comply with the plan's recommendations.  (*Id.* at 49:22-50:3.)  Mitigation plans are an alternative to license revocation, but a landlord's refusal to enter into a mitigation plan does not necessarily result in revocation.  (*Id.* at 57:17-60:5.)

Excluding those involving Azam, the City entered into nine other mitigation plans since 2009. (*Id.* at 56:11-18.) According to Captain Austin, the other property owners continued to be successful after completing their plans. (*Id.* at 58:15-21.)

## II.    ENFORCEMENT EFFORTS

The concerns over Azam's properties began in 2009, when the City observed "an inordinate amount of crime and calls for service" at Azam's properties. (Zipf Aff., Ex. J at 1.) On May 23, 2009, Police Chief Scott Nadeau ("Chief Nadeau") emailed Sergeant Matt Markham noting the City's complaints about Azam's properties. (*See* Kemp Aff., Ex. HH.) Chief Nadeau commented on the "busy night" at one of Azam's Tyler Street properties, stating that it "looks like it continues to be a problem." (*Id.*) He further stated that Captain Austin was "meeting with the owner . . . to try to get a mitigation plan going there, or [he would] advocate pulling the rental license." (*Id.*) Finally, Chief Nadeau stated that the City should "start to try and document the insanity on that property and in the neighborhood for when (not if) we try to pull the license," including documenting "crowds, loitering and other activity in the neighborhood." (*Id.*)

After Chief Nadeau's email, the City entered into mitigation plans with Azam for his Tyler Street properties in 2009 and his University Avenue properties in 2010. (Austin Dep. at 73:24-74:4; Azam Dep. at 128:23-129:6, 131:11-24.) Both of the mitigation plans included similar recommendations aimed to address the frequent police calls at Azam's properties. Azam agreed to: (1) conduct background checks on prospective tenants, (2) establish an action plan for how to prevent criminal activity if renting to a tenant with criminal history, (3) hire an on-site manager to maintain order at the

buildings, (4) personally visit the buildings during weekend evenings for one month, and (5) meet with police officials monthly for six months to discuss mitigation strategies. (Zipf Aff., Ex. L, Ex. M.)  The police also agreed to perform a study of the properties and make further recommendations about ways Azam could reduce criminal activity in the area.  (*Id.*)  Azam acknowledged that the City suggested additional changes, such as additional lights and fences, but stated that he did not think the changes improved the property.  (Azam Dep. at 129:2-17, 131:11-132:13.)  It appears that Azam complied with the mitigation plans' recommendations.  (Kemp Aff., Ex. GG.)  At the time, the mitigation plans were considered successful in decreasing the amount of calls and crime-related problems at Azam's properties.  (Austin Dep. at 77:11-22.)  However, according to Captain Austin, whereas other buildings maintained lowered levels of criminal activity after mitigations plans, Azam's properties did not.  (*Id.* at 58:15-59:9, 91:9-21.)

The City and Azam continued to work together, and between 2009 and 2013, Azam met with City officials at least twenty-two separate times in addition to phone calls and other contacts.  (Azam Dep. at 127:22-128:9; Austin Dep. at 103:12-18; Kemp Aff., Ex. KK.)  Captain Austin described Azam as cordial throughout these exchanges, but noted that he clearly did not implement the strategies they discussed.  (Austin Dep. at 103:2-11.)  Azam admitted that he was told during these meetings that his properties were some of the City's worst.  (Azam Dep. at 169:13-170:11.)

In September 2013, Captain Austin met with Azam and discussed the disproportionate number of police calls at his properties as well as specific instances of criminal activity.  (*See* Zipf Aff., Ex. O.)  In a letter following the meeting, Captain

Austin warned Azam that "future violations of the Property Maintenance Code, specifically safety and security issues such as improper or broken door locks and unsecure fire doors . . . may result in an immediate citation for the violation."  (*Id.*)  Finally, Azam was warned that the police calls and inspection problems would be brought to the City Council's attention during his 2014 rental license renewal.  (*Id.*)

On September 18, 2013, Captain Austin sent a memorandum to all officers detailing additional efforts planned to address the problems at Azam's properties.  (Kemp Aff., Ex. JJ.)  The memorandum directed police officers to conduct weekly walkthroughs of Azam's properties to look for ordinance violations.  (*Id.*)  Officers were told to cite for all violations of city ordinances or statutes.  (*Id.*)  Finally, the officers were specifically directed to watch for violations involving "security, safety and health issues," including unsecure exterior doors and open laundry-room doors.  (*Id.*)  According to Captain Austin, this memorandum resulted from a discussion between himself, Chief Nadeau, Officer Nightingale, another Sargent, and the City Attorney.  (Austin Dep. at 98:21-99:21.)  The group sought a new solution to the problems on Azam's properties after "a couple of significant calls to the properties," including one where a handgun was recovered from a baby's crib.  (*Id.*)  Captain Austin said that the City spent a significant amount of time working with Azam, but that the efforts did not have a "lasting effect," and so they chose to pursue the course of action outlined in his memo.  (*Id.*)

Captain Austin admitted that the City had never subjected other properties to weekly walkthroughs, but claimed that no other properties "ha[d] risen to the level of calls for service and criminal activity compared to [Azam's] properties."  (*Id.* at 95:6-15.)

- 8 -

He also could not remember any other instances where he had told his officers to "go through and write up violations" for a property. (*Id.* at 95:16-96:7.) Finally, Captain Austin acknowledged that the "[o]ther property maintenance code violations" referenced in the memo were usually handled by the fire department rather than by police officers. (*Id.* at 96:8-17.)

The officers completed weekly walkthroughs of Azam's properties, reporting the results to Captain Austin. (*Id.* at 97:13-21; Kemp Aff., Ex. KK.) Captain Austin authorized the officers to use fire keys to gain entrance to the buildings if necessary. (Austin Dep. at 97:22-25.) These weekly visits resulted in at least ten criminal citations, including citations for propped open laundry doors, broken front-door locks, and missing or ineffective smoke detectors in apartment units. (Zipf Aff., Ex. P at 3-6; Kemp Aff., Ex. KK.) According to Captain Austin, although other property owners had been cited for violations of the property code, he could not think of anyone else cited more than once over a period of six months. (Austin Dep. at 146:3-18.) Seven other property owners had each been charged with a single criminal violation of the Property Code since January 2013. (Zipf Aff., Ex. G at 3.)

Azam challenged the citations in state court, alleging that the officers violated his Fourth Amendment rights by entering his buildings without a warrant and failed to give him notice and time to remedy the violations. In a June 2014 order, the state court found that the searches did not violate Azam's Fourth Amendment rights because he lacked a reasonable expectation of privacy in common areas of his apartment buildings; nonetheless, the court dismissed the charges because Azam did not have an opportunity

to remedy the violation, resulting in improper strict liability.[2]  (*Id.*, Ex. P at 2, 11.)  The City did not appeal the ruling.

## III.   REVOCATION OF AZAM'S RENTAL LICENSES

### A.      March 24 City Council Hearing

On January 15, 2014, Chief Nadeau sent Azam a letter informing him that the police department and fire department planned to meet with the City Council on March 24, 2014, to discuss the police calls and code violations at his properties, and that the police and fire department would recommend that the council deny renewal of his rental licenses.  (*Id.*, Ex. Q.)

During the March 2014 hearing, Chief Nadeau and Captain Austin presented information about Azam's University Avenue and Tyler Avenue properties, even though the revocation would only involve the buildings currently up for renewal – the University Avenue properties.  (*Id.*, Ex. J; *id.*, Ex. R at 4-7.)  Chief Nadeau and Captain Austin discussed the numerous contacts between the Police Department and Azam over the previous four years.  (*Id.*, Ex. J at 1, 6.)  Captain Austin presented statistics comparing each of Azam's properties to other properties of the same size on metrics including: total police reports, Part I and II offenses, nuisance calls for service letters, and three-strike nuisance conduct and immediate eviction letters.  (*Id.* at 7-20.)  Fire Chief Gorman spoke about the increased fire department activity on Azam's properties.  (*Id.* at 21-25.)

---

[2] The state court also dismissed one of the charges, relating to snow removal, based on a lack of probable cause and the vagueness of the statute.  (Zipf Aff., Ex. P at 10.)

Chief Nadeau provided the council with three possible courses of action: (1) renewal; (2) non-renewal; and (3) conditional licensure, which could include an increased fee and the goal of attaining average calls for inspection. (*Id.*, at 26; *id.*, Ex. R at 5.) One of the councilmembers asked for Chief Nadeau's recommendation. (*Id.*, Ex. R at 5.) In response, Chief Nadeau recommended revoking Azam's licenses; he emphasized his concern for resident safety and stated that he was not confident that the problems would be corrected. (*Id.*) Chief Gorman agreed, highlighting the amount of time his staff spent on Azam's properties and their lack of improvement. (*Id.*)

Two tenants spoke at the hearing, expressing concern over being required to move. (*Id.* at 6.) Azam's attorney spoke on his behalf. (*Id.* at 6.) He questioned the statistics cited by the City, and claimed that there was no evidence that Azam was not trying to comply with the City's ordinances. (*Id.*; *id.*, Ex. K at 49:30-51:00.) Azam had made efforts to work with the City and the cited violations had been corrected. (*Id.*, Ex. R at 6.) He claimed that Azam could not evict residents for calling the police under Minnesota law. (*Id.*) Additionally, he stated that Azam worked with charitable organizations to place at-risk or homeless people in housing and questioned where Azam's residents would find housing without his buildings. (*Id.*)

The City Council unanimously voted to approve the resolutions, revoking both of Azam's University Avenue rental licenses. (*Id.*; *id*., Ex. S.) On March 25, 2014, Captain Austin sent a memorandum to all officers informing them that the City Council had revoked Azam's University Avenue rental licenses. (Kemp Aff., Ex. MM.) He stated that the tenants would have 45 days to vacate, but that the City did not intend to forcibly

remove tenants, and the officers would work with tenants to connect them with resources to find other living arrangements. (*Id.*) Captain Austin directed the officers to discontinue their weekly walkthroughs of Azam's properties. (*Id.*) Captain Austin discontinued the walkthroughs because of the license revocation and also because he heard that the properties were being sold. (Austin Dep. at 119:15-25, 120:25-121:8.)

## B.     April 28 City Council Hearing

On March 27, 2014, Chief Nadeau sent Azam two letters informing him that the City Council would hold a hearing regarding his Tyler Street and Pierce Street rental licenses on April 28, 2014, and that the fire and police departments would recommend revocation. (Zipf Aff., Ex. T.) The Pierce Street property revocation would be based on § 5A.408(E) of the Property Code, which states that a person with two or more revoked licenses is ineligible to hold any rental license within the City for five years. (*Id.*)

On April 28, 2014, the City Council held a hearing about Azam's Tyler Street and Pierce Street rental licenses. Chief Nadeau, Captain Austin, and Chief Gorman gave an abbreviated version of the same presentation given in the first hearing. (*Id.*, Ex. U at 3.) They discussed their concerns about the health and safety of Azam's residents and the disproportionate number of service calls at his properties. (*Id.*)

Three Tyler Street residents spoke at the hearing. (*Id.* at 4.) The first tenant stated that she felt safer with the new owner; she called the management of Azam's buildings "a bunch of slumlords" who only wanted to collect rent and let the buildings "go down in shambles." (*Id.*, Ex. V at 28:00-29:30.) The second tenant said that many of the medical calls were for his sick wife. (*Id.*, Ex. U at 4.) The last tenant stated that he liked living in

the building, but that the old owner was only interested in collecting money and did not fix anything.  (*Id.*)  The new owner also spoke at the hearing, and expressed concern about the consequences he would face due to Azam's rental-license revocation.  (*Id.* at 3-4.)  However, the City Attorney emphasized that the hearing would not affect the new owner's ability to apply for a rental license.  (*Id.* at 4.)

The City Council unanimously approved the resolution revoking the rental licenses for Azam's Tyler Street properties.  (*Id.*; *id.*, Ex. W at 1-5.)  Then, with regard to the Pierce Street property, the City Attorney told the City Council that because two of Azam's licenses had been revoked, he could no longer hold a rental license for any property in the City.  (*Id.*, Ex. U at 5.)  A few residents spoke about the Pierce Street property, generally complaining about Azam and expressing concern over the consequences of revocation for the tenants.  (*Id.*)  The City Council unanimously approved the resolution revoking Azam's Pierce Street rental license.  (*Id.*; *id.*, Ex. W at 6-7.)

## IV.    PROCEDURAL HISTORY

On March 24, 2014, Azam brought this case against the City in state court alleging violations of (1) 42 U.S.C. § 1983 based on the Fourth and Fourteenth Amendments, (2) 42 U.S.C. §§ 1981, 1982, and 1985, (3) the FHA, and (4) requesting a declaratory judgment and injunctive relief.  (Notice of Removal, Ex. A ("Compl."), Apr. 11, 2014, Docket No. 1.)  On April 11, 2014, the City removed to federal court based on federal question jurisdiction.  (Notice of Removal.)  On May 15, 2015, the City filed the instant motion for summary judgment on all claims, which Azam opposes.

# DISCUSSION

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49)).

## II.    DISCRIMINATORY INTENT

Azam claims that the City impaired his ability to enforce contracts in violation of § 1981, impaired his ability to lease real estate in violation of § 1982, and that City agents

worked together to deprive him of his rights in violation of § 1985. Azam also alleges a disparate treatment claim under the FHA. All of these claims require a showing of discriminatory intent.[3] Discriminatory intent can be shown either through direct evidence or indirect evidence under the *McDonnell Douglas* burden-shifting framework. *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010). Because, as discussed below, Azam has not shown any evidence leading to an inference of discriminatory intent, the Court will dismiss these claims.

Azam argues that he was discriminated against either based on his Indian descent or based on his tenants' protected status. Azam admits that the City never used derogatory terms or slurs, (Azam Dep. at 14:8-13, 15:21-16:6), and he has not pointed to any direct evidence of discriminatory purpose. Instead, he relies on indirect evidence. Primarily, he argues that the City's alleged inconsistent enforcement of the City codes and departures from normal procedures supports an inference of discriminatory purpose. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (finding that "[d]epartures from the normal procedural sequence" may suggest influence by "improper purposes").

---

[3] *See Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004) (finding that a prima facie case for a § 1981 claim required intentional discrimination based on membership in a protected class); *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004) (finding that a § 1982 claim required discriminatory intent); *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 684-85 (8th Cir. 2012) (finding that "[t]he 'purpose' element of [a § 1985 claim] requires that the plaintiff prove a class-based invidiously discriminatory animus"); *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010) (finding that FHA disparate treatment claims apply the same analysis as Title VII disparate treatment claims, for which "[p]roof of discriminatory purpose is crucial").

This argument fails because Azam has not shown that the City inconsistently enforced any laws.  He has provided no evidence suggesting that other property owners violated the Property Code without facing consequences – aside from his own general claims that his buildings were not the worst – nor does the evidence show that other owners were responsible for similar calls for service without facing similar fees or revocations.  Admittedly, some of the evidence suggests that the City varied from its usual practice in a number of ways:  the City performed weekly walkthroughs of Azam's apartment buildings for six months and revoked Azam's licenses based on disproportionate police calls, both of which it had never done before.  However, none of the evidence suggests that this difference is caused by an improper motive, let alone a discriminatory one based on Azam's race or the race of his tenants.  Rather, as the City claims, the evidence suggests that the conditions around Azam's buildings were a persistent problem that the City sought to address.  Statements made by Azam's tenants in both revocation hearings support this idea, including one resident referring to Azam as a "slumlord."  Azam does not provide any evidence calling into question the City's proffered motivation aside from his own statements claiming that he was not the worst in the neighborhood, which is insufficient alone to allow an inference of discriminatory intent.

Azam also notes that the City stopped performing weekly walkthroughs of the property immediately after the first hearing, when Azam's first licenses were revoked. He claims that this shift in practice, while he still owned the property and when nothing else had changed, shows that the City's stated goals, which he describes as "housing code

enforcement," were a mere pretext.  However, Azam's view of the City's goals is too narrow.  Based on the record, it appears that the increased activity was not intended solely to enforce the code, but also to document Azam's continual failure to follow the code, specifically in order to revoke his license if necessary.[4]  In sum, Azam has not provided any basis for an inference of discriminatory intent, and therefore, there are no genuine issues of material fact necessitating trial on his §§ 1981, 1982, and 1985 claims and his disparate treatment FHA claim.

### III.   FOURTH AMENDMENT

Azam brings a Fourth Amendment claim through § 1983, alleging that the City violated his rights by searching the common areas of his apartment buildings without a search warrant.  A search "may violate an individual's Fourth Amendment rights as either a trespassory search or a violation of a reasonable expectation of privacy."  *United States v. Mathias*, 721 F.3d 952, 957 (8th Cir. 2013).  Here, Azam's Fourth Amendment claim fails because the City's searches did not result in an intrusion into a constitutionally protected area enumerated in the Fourth Amendment[5] or into an area in which Azam had a reasonable expectation of privacy.[6]

---

[4] Chief Nadeau's 2009 email suggests that one of the City's goals was to document problems on Azam's property in order to have evidence to show the City Council at a revocation hearing.  (*See* Kemp Aff., Ex. HH.)  Similarly, in his memorandum directing weekly walkthroughs, Captain Austin focused on "better document[ing] the issues on [Azam's] properties."  (*Id.*, Ex. JJ.)

[5] The parties did not discuss whether the search intruded on a constitutionally protected area under *United States v. Jones*, 132 S. Ct. 945, 951 (2012).  However, "[t]he Fourth Amendment protects against trespassory searches only with regard to those items ('persons,

(Footnote continued on next page.)

The essential question discussed by the parties for Azam's Fourth Amendment claim is whether or not he had a reasonable expectation of privacy in the space searched. *See Minnesota v. Carter*, 525 U.S. 83, 88-89 (1998) (finding that protection under the Fourth Amendment "depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place").   Azam relies on cases involving searches of apartment units themselves, where courts have found that a tenant has a reasonable expectation of privacy.  *See Camara v. Mun. Court of City & Cty. of S.F.*, 387 U.S. 523, 534 (1967) (requiring a warrant for administrative searches of individual apartments); *Rozman v. City of Columbia Heights*, 220 F.3d 864, 867-68 (8th Cir. 2000) (noting that a search of a tenant's unit required tenant consent or an administrative warrant and the landlord could not force the tenant to consent), *aff'd en banc* 268 F.3d 588 (8th Cir. 2001).  However, the searches at issue in this case took place in the common areas of Azam's apartment buildings, not the individual units.

---

(Footnote continued.)

houses, papers, and effects') that it enumerates." *Id.* at 953 n.8.  Here, the intrusion was not into Azam's person, house, paper, or effect, and therefore, Azam must rely on the reasonable expectation of privacy standard.

[6] The City also argued that Azam was barred from relitigating whether or not he had a reasonable expectation of privacy in the common areas of his apartment building because he already raised and lost on that issue in a state court proceeding.  However, Azam rightfully argues that only those parts of the decision that were "necessary and essential to the resulting judgment" have preclusive effect. *Hauschildt v. Beckingham*, 686 N.W.2d 829, 837 (Minn. 2004).  While the state court did find that Azam did not have a reasonable expectation of privacy in the common areas of his apartment buildings, this finding was not the basis for the court's decision.  Instead, the state court dismissed the charges against him by finding that the City improperly applied strict liability. (Zipf Aff., Ex. P at 11.)

A number of circuit courts, including the Eighth Circuit, have found that a resident lacks a reasonable expectation of privacy in common areas of a multi-unit apartment building because it is a shared space and an expectation of privacy in that context would be unreasonable. *See United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977) (finding no reasonable expectation of privacy in the common hallway of an apartment building); *see also United States v. Correa*, 653 F.3d 187, 190-91 (3d Cir. 2011) (finding no reasonable expectation of privacy in a common stairway in locked multi-unit apartment building); *United States v. Miravalles*, 280 F.3d 1328, 1333 (11th Cir. 2002) (finding no reasonable expectation of privacy in in common areas of a multi-unit building with an "undependable lock"); *United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir. 1993) (finding no reasonable expectation of privacy in a locked hallway); *United States v. Concepcion*, 942 F.2d 1170, 1171-72 (7th Cir. 1991) (finding no reasonable expectation of privacy in a locked hallway of a six-unit dwelling).

Other courts have also considered a landlord's expectation of privacy, finding no reasonable expectation of privacy in tenants' apartments or common areas, unless the landlord lives there or stores items in the space. *See Shamaeizadeh v. Cunigan*, 338 F.3d 535, 544-45 (6th Cir. 2003) (finding no reasonable expectation of privacy for an owner renting out the basement); *Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 234-35 (E.D.N.Y. 2010) (finding that landlords had no reasonable expectation of privacy in leased apartments where they did not keep property, but that fact issues remained as to whether the landlords had a reasonable expectation of privacy in the basement where they maintained a private room and exclusive possession).

In light of this case law, the Court finds that Azam did not have a reasonable expectation of privacy in the common areas of his apartment buildings.  Although Azam owned the buildings, there is no evidence suggesting that he lived in them or kept belongings in them.  It would be unreasonable for Azam to expect privacy under those circumstances.

Azam tries to avoid this outcome by citing to cases involving searches of businesses.  *See Marshall v. Barlow's, Inc.*, 436 U.S 307, 324 (1978) (finding that a statute authorizing warrantless inspections of businesses was unconstitutional); *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452-53 (2015) (requiring the opportunity for precompliance review for searches of hotel guest lists).  The Court has recognized legitimate expectations of privacy in offices and commercial buildings in part "based upon societal expectations that have deep roots in the history of the [Fourth] Amendment."  *Oliver v. United States*, 466 U.S. 170, 178 n.8 (1984).  However, Azam cites no case law suggesting that searches of a landlord's apartment building falls into this category of business searches rather than following the apartment-specific cases already discussed.

Azam also argues that the City cannot simultaneously rely on an "expansive" understanding of Azam's property interest to justify criminal citations and other actions, but "shrink" the interest just small enough to circumvent the Fourth Amendment.  Azam compares this "contradiction" with that addressed by the Supreme Court in *Jones v. United States*, 362 U.S. 257, 263-64 (1960), which developed the "automatic standing rule" later overturned in *United States v. Salvucci*, 448 U.S. 83, 95 (1980).  Azam argues

that the rationale behind the automatic standing rule applies to the present situation. However, the reasoning of the *Salvucci* court contradicts Azam's argument. In *Salvucci*, the Court found that its precedent "clearly establish[ed] that a prosecutor may simultaneously maintain that a defendant criminally possessed the seized good, but was not subject to a Fourth Amendment deprivation, without legal contradiction." 448 U.S. at 90. This is because Fourth Amendment protection is not based on legal possession, but rather, as discussed previously, it is based on a reasonable expectation of privacy. *Id.* at 91. Therefore, the City can contend that Azam was the owner and landlord of the property, and thus responsible for the property under the Property Code, but at the same time, applying Fourth Amendment case law, he may not have a reasonable expectation of privacy in the apartments and common areas. These two statements do not require contradictory views on Azam's possessory interest in his apartment buildings.

Thus, because the City did not intrude upon a constitutionally protected area or an area in which Azam had a reasonable expectation of privacy, his Fourth Amendment claims must fail.

## IV.   SUBSTANTIVE DUE PROCESS

To establish a substantive due process violation, Azam must demonstrate that (1) he was deprived of a protected property interest and (2) the state chose an irrational means to deprive him of that interest. *BHGDN, LLC v. Minnesota,* 598 F. Supp. 2d 995, 1002 (D. Minn. 2009). He must show "more than that the government decision was arbitrary, capricious, or in violation of state law." *Chesterfield Dev. Corp. v. City of Chesterfield,* 963 F.2d 1102, 1104 (8th Cir. 1992). Instead, the evidence must

demonstrate "truly irrational" governmental actions. *Id.* (citing *Lemke v. Cass Cty., Neb.*, 846 F.2d 469, 472 (8th Cir. 1987)). An example of such irrationality might be "attempting to apply a zoning ordinance only to persons whose names begin with a letter in the first half of the alphabet." *Id.* A substantive due process claim may also exist where the government's conduct "shocks the conscience or otherwise offends 'judicial notions of fairness, [or is] offensive to human dignity.'" *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) (quoting *Weimer v. Amen*, 870 F.2d 1400, 1405 (8th Cir. 1989)).

In Azam's complaint, he alleges violations of due process "including charging [him] with civil fines and criminal citations for violations of city housing ordinances which are preempted by the state housing code, by conducting illegal searches of [his] properties, and by interfering with his rights to contract for the leasing of his [p]roperties without due process." (Compl. ¶ 38.) In response to the instant motion, Azam argues that his substantive due process rights were violated by Chief Nadeau's "plan" starting in 2009 to pull Azam's license, and the actions taken in furtherance of that plan, including nuisance service call fees, mitigation plans, targeted enforcement, and revocation of Azam's rental licenses.

None of the actions complained of are sufficiently irrational or outrageous to support a substantive due process claim. First, Azam questions the City's nuisance service call policies, which are measured per property rather than per unit and which include fees for residents near the property and non-residents on the property. However, other property owners faced the same policies without similar problems. Azam also

challenges the fact that he was "required" to submit to a second mitigation plan even though the first plan was successful. However, the plans appear to be optional, not mandatory, and there is evidence that Azam's buildings were successful for a period of time but then worsened. Azam also claims that the City applied an illogical standard when comparing his properties to similarly sized properties rather than similarly situated properties in higher crime neighborhoods. Finally, Azam argues that the City inflated the statistics presented to the City Council by increasing enforcement efforts at his properties during part of 2013. The City has provided rational bases for these policies. Yet even assuming for the sake of argument that they are illogical, they are still not truly irrational, which requires more than mere arbitrary governmental action.

The Court finds that these policies and actions do not amount to substantive due process violations individually or in the aggregate. Azam repeatedly frames the City's actions as a continual escalation or "increasingly oppressive activities." However, the escalation does not appear truly irrational or oppressive, as it is rational for the City to attempt less drastic solutions and then increase the pressure in trying to remedy a problem property. The City's conduct demonstrates its willingness to work with Azam between his first mitigation plan in 2009 and the revocation of his licenses in 2014, not truly irrational and oppressive action. Accordingly, there are no genuine factual disputes necessitating trial of Azam's substantive due process claim.

## V.    DISPARATE IMPACT FHA CLAIM

Azam next brings a disparate impact claim under the FHA, alleging that the City's actions "have the effect of making affordable rental dwellings unavailable, and . . . have a

disparate impact [on] persons intended to be protected by the [FHA]."  (Compl. ¶ 23.)
The Supreme Court recently found that disparate impact claims are viable under the
FHA.  *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct.
2507, 2525 (2015).  Such claims are subject to a burden shifting framework, as well as
"cautionary standards" and "safeguards" at each stage to avoid "displac[ing] valid
government and private priorities" due to fear of disparate impact liability.  *Id.* at 2514-
15, 2524.

> First, the plaintiff must establish a prima facie case by showing that a "challenged
practice caused or predictably will cause a discriminatory effect."   24 C.F.R.
§ 100.500(c)(1).  At this stage, the plaintiff must satisfy a "robust causality requirement"
by showing facts or statistical evidence establishing a "causal connection" between the
policy and the disparate impact.  *Tex. Dep't of Hous. & Cmty. Affairs,* 135 S. Ct. at 2523-
24.  If the plaintiff satisfies this burden, then the defendant must show "that the
challenged practice is necessary to achieve one or more substantial, legitimate,
nondiscriminatory interests."  24 C.F.R. § 100.500(c)(2).  At this stage, the Supreme
Court has emphasized that governmental entities "must not be prevented from achieving
legitimate objectives, such as ensuring compliance with health and safety codes."  *Tex.
Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2524.  Finally, if the defendant meets its
burden, the plaintiff may respond by showing that the legitimate interests "could be
served by another practice that has a less discriminatory effect."   24 C.F.R.
§ 100.500(c)(3).

A.     **Prima Facie Case**

As explained above, to establish a prima facie case, Azam must show that a City policy or practice caused a discriminatory effect.  Azam claims that the policy or practice at issue here is almost identical to a policy that the Eighth Circuit found to have a discriminatory effect in *Gallagher v. Magner*, 619 F.3d 823, 837 (8th Cir. 2010).  The policy in *Gallagher* was "that the City [of St. Paul] issued false Housing Code violations and punished property owners without prior notification, invitations to cooperate with [the housing department], or adequate time to remedy Housing Code violations."  *Id.* at 834.  The instant action, however, is distinguishable.  *Gallagher* involved multiple plaintiffs and allegations of widespread over-enforcement of the Housing Code.  *Id.* at 829-30 (describing increased housing code enforcement for three years targeting problem properties, but also conducting "sweeps" to detect other violations).  Here, Azam has not alleged or shown that the City acted similarly with any other individuals or at any other instances.  Additionally, a single decision generally is not an identifiable policy capable of supporting a disparate impact claim.  *See Tex. Dep't of Hous. & Cmty. Affairs,* 135 S. Ct. at 2523 ("For instance, a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all.").  In this case, a series of decisions involving the same property owner also may not be an identifiable policy.

Furthermore, Azam likely has not shown a causal connection to a discriminatory effect.  Azam again relies on *Gallagher*.  There, the Eighth Circuit reversed the district

court's grant of summary judgment on the ground that the plaintiff had shown that: (1) the City of St. Paul experienced a shortage of affordable housing, (2) racial minorities made up a disproportionate percentage of lower-income households that relied on low-income housing, (3) the City's aggressive housing code enforcement practices increased costs for property owners that rent to low-income tenants, and (4) the increased burden on rental-property owners from aggressive code enforcement resulted in less affordable housing the City. *Gallagher*, 619 F.3d at 834-35. Considering these facts together, the Eighth Circuit found that the City's "aggressive enforcement of the Housing Code resulted in disproportionate adverse effect on racial minorities." *Id.* at 835. It is unclear if the facts in *Gallagher* would be sufficient to satisfy the "robust causality requirement" described in *Texas Department of Housing and Community Affairs*.[7] However, even if they would, Azam's allegations are distinguishable. Azam has not shown that the City's housing code enforcement has generally increased costs for property owners that rent to low-income tenants, aside from the fees charged for his properties. Additionally, even though Azam was forced to sell his buildings, it appears that they were purchased by other investors; therefore, he has not shown that there is now less affordable housing in the City. *See Ellis v. City of Minneapolis*, No. 14-3045, 2015 WL 5009341, at *10 (D. Minn. Aug. 24, 2015) (finding no causal link where plaintiffs did not show that they were "prevented from renting any of their units or that any tenants have been displaced").

---

[7] The Supreme Court actually commented on the *Gallagher* decision in *Texas Department of Housing and Community Affairs*: "Although the Court is reluctant to approve or disapprove a case that is not pending, it should be noted that [*Gallagher*] was decided without the cautionary standards announced in this opinion and, in all events, the case was settled by the parties before an ultimate determination of disparate-impact liability." 135 S. Ct. at 2524.

**B.     Legitimate Government Interests and Alternative Practice**

Even if Azam has established a prima facie case, the City has shown a legitimate government interest for its actions.  Courts have recognized that "ensuring compliance with health and safety codes" is a legitimate government interest.  *See Tex. Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2524; *Ellis*, 2015 WL 5009341, at *11.  Azam has not made any arguments related to whether the City has met this burden.  Azam also has not suggested any alternative practices that would satisfy the legitimate government interest of ensuring compliance with health and safety codes.  Accordingly, under the burden shifting framework, Azam's claim fails even if he has established a prima facie case.

## VI.    DECLARATORY AND INJUNCTIVE RELIEF

Finally, Azam seeks a declaratory judgment and injunctive relief against the City.  Specifically, in his complaint, Azam asks the Court to rule on whether the City must seek an administrative warrant to perform inspection, and for the Court to "enjoin[ the City] from enforcing by criminal sanction or otherwise its own housing code when that code is more stringent than the [State's] housing code."  (Compl. ¶ 45.)   However, Azam's declaratory judgment action is not an independent cause of action.  *See Daywitt v. Minnesota*, No. 14-4526, 2015 WL 4094199, at *14 (D. Minn. July 6, 2015) (finding that a request for declaratory and injunctive relief was not an independent cause of action, but rather, was dependent on the underlying constitutional challenge) (citing *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) ("[T]he Declaratory Judgment Act . . . does not provide

an independent basis for federal jurisdiction.")).   Because Azam's underlying constitutional claims will be dismissed, his claim for injunctive and declaratory relief will be dismissed as well.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendant's Motion for Summary Judgment [Docket No. 19] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  February 3, 2016                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                                   JOHN R. TUNHEIM
                                                                      Chief Judge
                                                            United States District Court